Sam Novell and Ida Novell, et al., [1] Petitioners v. Commissioner. Novell v. Comm'r
Docket Nos. 4735-67, 4749-67, 4757-67, 4758-67, 4919-67. United States Tax Court
T.C. Memo 1969-255; 1969 Tax Ct. Memo LEXIS 38; 28 T.C.M. (CCH) 1307; T.C.M. (RIA) 69255; December 2, 1969, Filed. Melvin I. Muroff, 150 S.E. 2nd Ave., Miami, Fla., for the petitioners. W. Reeder Glass, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax of the petitioners in these consolidated proceedings as follows: Petitioner
Year
Deficiency
Sam and Ida Novell -
Docket No. 4735-67
1963
$ 891.65
1964
3,294.38
Estate of Nathan Miller,
Deceased, Amelia Miller
Executr x
1961
817.32 and Amelia Miller -
Docket No. 4749-67
1964
3,200.78
Harvey and Linda Factor - Docket No. 4757-67
1963
480.89 1964
* 902.77
Oscar J. and Harriet
Mannen - Docket No. 4758-67
1963
907.38 1964
* 2,676.89
Manvil Development Corp.
of Broward -
Docket No. 4919-67.
FYE 4-30-64
$ 27,871.15
*39 We must decide whether Manvil Associates, Inc. qualified as an electing small business corporation under subchapter S of the Internal Revenue Code of 1954 during its taxable years 1963 and 1964 and whether Manvil Development Corp. of Broward similarly qualified during its taxable years 1963 and 1964. If we decide that either corporation so qualified during these years then we must decide whether there are nevertheless due from the individual petitioners deficiencies in income taxes for their taxable years 1963 and 1964 resulting from their recovery of money during 1964 from Manvil Development Corp. of Broward in excess of their bases in their respective stock and debt in that corporation and from their respective deductions of net operating losses of Manvil Associates, Inc. in excess of their bases in its stock and debt. Second, we must decide whether petitioner Oscar J. Mannen incurred in 1963 a deductible loss from the demolition of a building located in Hazleton City, Pennsylvania. *40 1308 General Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference. Petitioner Manvil Development Corp. of Broward (hereinafter referred to as Manvil Development), a Florida corporation, had its principal place of business in Boca Raton, Florida at the time it filed its petition herein. Manvil Development filed small business corporate income tax returns for its fiscal years ending April 30, 1963 and April 30, 1964 with the district director of internal revenue, Jacksonville, Florida. Petitioners Sam and Ida Novell (hereinafter referred to as Novell), husband and wife, resided in Miami, Florida at the time they filed their petition herein. Petitioners Nathan and Amelia Miller (hereinafter referred to as Miller), husband and wife, resided in Miami Beach, Florida at the time they filed their petition herein. Nathan Miller is deceased. The Estate of Nathan Miller, Deceased, Amelia Miller, Executrix, has been substituted for him as a petitioner. Petitioners Harvey and Linda Factor (hereinafter referred to as Factor), husband and wife, resided in North Miami Beach, Florida *41 at the time they filed their petition herein. Petitioners Oscar J. and Harriet Mannen (hereinafter referred to as Mannen), husband and wife, resided in Miami, Florida at the time they filed their petition herein. The individual petitioners referred to above all filed joint income tax returns for 1963 and 1964 with the district director of internal revenue, Jacksonville, Florida. Manvil Associates, Inc. (hereinafter referred to as Manvil Associates), a Florida corporation, filed small business corporate returns for its fiscal years ending April 30, 1963 and April 30, 1964 with the district director of internal revenue, Jacksonville, Florida. Issue I. Tax Consequences Relating to Manvil Associates, Manvil Development, and Their Respective Shareholders Findings of Fact Manvil Associates was incorporated on December 18, 1961, with authorized capital of 100 shares of $10 par value stock. It was specifically authorized to sponsor, build and develop cooperative apartment houses. The 100 authorized shares were issued at par to the following persons in the amounts indicated: Stockholder
No. of Shares
Mannen (by the entirety)
40
Miller (by the entirety)
18
Novell (by the entirety)
23
Factor (by the entirety)
10
Joseph Rekant
9
*42 Manvil Associates had no assets other than the paid-in capital of $1,000. The company determined to construct and sell a 72-unit cooperative apartment complex to be named Floridian Arms. The land on which Floridian Arms was to be constructed was owned by Manvil Associates' shareholders in the same proportion as their ownership of Manvil Associates common stock: Mannen (by the entirety) an undivided 40% interest Novell (by the entirety) an undivided 23% interest Miller (by the entirety) an undivided 18% interest Factor (by the entirety) an undivided 10% interest Joseph Rekant an undivided 9% interest On May 1, 1962, these shareholders conveyed the land to Manvil Associates which then mortgaged the land to Peoples National Bank of North Miami Beach (hereinafter referred to as Peoples) as security for a $500,000 construction loan from Peoples to Manvil Associates. On May 5, 1962, Manvil Associates entered into a 99-year ground lease with Floridian Arms, Inc., a corporate entity to be comprised of the owners of the cooperative apartments in the Floridian Arms complex. The purchasers of cooperative apartments do not obtain an interest in the underlying ground. The lease *43 provided for a monthly rental of $1,246.25 with an option to purchase the land for $186,937.50 between January 1, 1975 and December 31, 1978. On May 7, 1962, Manvil Associates reconveyed the land to the shareholders, restoring to them their original undivided interests. The land continued to be subject to the mortgage to Peoples. On May 23, 1962, all the shareholders of Manvil Associates entered into an "Agreement for Deed" with Oscar J. Mannen, Trustee, agreeing to convey the land to him in fee simple, free of all encumbrances (including the $500,000 construction loan mortgage) except the 99-year ground lease, for $171,000. The $171,000 was to be paid in the following manner: $30,000 on execution of the agreement $30,000 in thirty days $30,000 in sixty days 1309 Balance when the property was deliverable as above. Mannen was to be credited with interest at the rate of 10 percent per annum on each portion paid from the date of payment to the date of conveyance. The agreement did not provide for any particular date for delivery of title to the land except that if the property were not deliverable as promised within 18 months, Mannen was given the right to demand from *44 the shareholders the return of his installments plus the interest provided. Upon his exercise of that right the "Agreement for Deed" was to become null and void. Instead of paying the $171,000 to the sellers under the "Agreement for Deed" Mannen paid it to Manvil Associates during its taxable year ending April 30, 1963. The entire amount was paid in during the 7 months after the "Agreement for Deed" was entered into. Interest in the amount of 10 percent per annum was paid on the installments and was reported on Mannen's income tax. Manvil Associates set up a "loan" account in Mannen's name on its books and credited the account with the $171,000 advanced by him. The money, which was used by Manvil Associates to finance the construction and operational costs of Floridian Arms, remained unpaid throughout Manvil Associates' taxable years ending April 30, 1963 and April 30, 1964. No note or other evidence of indebtedness was given to Mannen by Manvil Associates for this amount, nor was any collateral or security for repayment of the amount provided. Although amounts characterized as interest were paid on this money, there was no written agreement as to how much interest would be charged *45 and there was no fixed maturity date provided for the payment of interest or the repayment of principal. Correspondingly, Mannen had no legal right to force repayment at any certain date. He would not have taken any action to force payment if to do so would have weakened the corporation's economic position. Mannen's status, as far as repayment was concerned, was inferior to the position of Peoples under its $500,000 construction loan. Manvil Associates could not have obtained the money received from Mannen through an outside lending institution or investor under the same terms and informal arrangement as it did in the instant situation, nor did it attempt to do so. The transaction with respect to the "Agreement for Deed" was closed and title to the land was transferred to Mannen on July 6, 1964. After title was transferred to Mannen, the $171,000 credit in the loan account in his name was taken out and the regular individual shareholders' loan accounts were credited with the $171,000 in proportion to their undivided interests in the land (and directly in proportion to the shareholder interests of Mannen, Novell, Miller, Factor, and Rekant). The gain from their sale of the land to *46 Mannen was reported by the stockholders on their 1964 Federal income tax returns. In addition to the $500,000 construction loan from Peoples and the $171,000 advanced by Oscar J. Mannen, Manvil Associates financed the construction of Floridian Arms with advances from its shareholders. These advances were set up in shareholders' "loan" accounts. The balances in these accounts as of the end of Manvil Associates' taxable years 1963, 1964, and 1965 were reflected in Manvil Associates' income tax returns for these years as loans in the following amounts: [2]
1963
1964
1965
Mannen
$ 23,182
$ 24,182
$ 53,200
Novell
10,455
13,205
28,590
Miller
8,133
10,682
24,140
Factor
4,523
5,046
12,800
Rekant
4,091
5,341
11,970
Total
$ 50,384
$ 58,456
$ 130,700
*47 The 1964 and 1965 balances reflect the addition of current advances to the preceding year's balances. The alleged loan accounts were evidenced on the books of Manvil Associates by ledger sheets which indicated the advances as loans by the husband-shareholders. The loans were actually made by the husbands and wives jointly. Advance deposits from the sales of apartments were also used to finance the construction of Floridian Arms. The theory under which Manvil Associates entered into the Floridian Arms venture was to build the apartments and sell them, at a profit if possible, but more importantly to obtain a profitable lease of the underlying ground. As long as a profitable ground lease could be obtained, it did not make any difference to the stockholders whether Manvil Associates made money or not. The actual construction and operational costs incurred by Manvil Associates in completing the Floridian Arms exceeded the total sale price of all the cooperative apartments. Manvil Associates never operated at a profit. All of its creditors, however, with the exception of its stockholders, were paid. The stockholders profited from their sale to Mannen of the underlying ground lease. *48 Manvil Development was incorporated on February 19, 1962, with authorized capital of 100 shares of $10 par value stock. It was specifically authorized to sponsor, build and develop cooperative apartment houses, and was authorized during the years in question to construct and sell condominiums. The purchasers of condominium apartments, unlike the purchasers of cooperative apartments, obtain an interest in the underlying ground. The 100 authorized shares were issued at par to the following persons who held the stock in the amounts indicated through the taxable years involved in this suit: Stockholder
No. of Shares
Par Value
Mannen (by the entirety)
60
$ 600
Novell (by the entirety)
15
150 Factor (by the entirety)
15
150 Miller (by the entitety)
10
100 Manvil Development's primary business activity during its taxable years ending April 30, 1963 and April 30, 1964 was the construction and sale of an 82-unit cooperative apartment complex, hereinafter referred to as Venetian Park, to be constructed on land that had been conveyed to Manvil Development by its shareholders. To finance the construction of Venetian Park and to meet operational *49 costs, Manvil Development obtained a $500,000 construction loan from Miami National Bank (hereinafter referred to as Miami). As security for this loan, on July 23, 1962, Manvil Development gave Miami a $500,000 mortgage on the land and apartments which were to be constructed on Venetian Park. On September 4, 1962, Manvil Development entered into a 99-year ground lease with Venetian Park, Inc., a corporate entity which would ultimately be comprised of the owners of the cooperative apartments in Venetian Park. On September 5, 1962, 1311 Manvil Development conveyed the land, subject to the lease, back to its shareholders who continued to own the land during the taxable years in question. In addition to the $500,000 construction loan from Miami, Manvil Development also financed the construction of Venetian Park with advances from its shareholders and from advance deposits from the sales of apartments. The shareholders' advances were set up in shareholder loan accounts on the books of Manvil Development in the names of the individual husbands Mannen, Novell, Miller and Factor. At the end of Manvil Development's taxable year ending April 30, 1963, the stockholder's loan accounts *50 had the following balances: Account No. 1
Mannen
$128,352
57%
Novell
37,588
17
Miller
23,725
11
Factor 34,588
15
$224,253
100% Although additional amounts were paid in during Manvil Development's taxable year ending April 30, 1964, by the end of that year all of the shareholder advances for the construction of Venetian Park had been repaid, either from advance payments by prospective purchasers of apartments or from the ultimate sales of apartments. During its taxable year ending April 30, 1964, Manvil Development completed construction of Venetian Park and sold most of the apartments. The theory under which Manvil Development entered into the Venetian Park venture was to construct and sell at a profit if possible, the cooperative apartments, but more importantly to obtain a profitable lease of the underlying ground. Manvil Development actually made a profit on its construction of Venetian Park. The construction loan from Miami and the shareholder advances for Venetian Park were all repaid. The shareholder advances to Manvil Associates to finance the construction of Floridian Arms and the shareholder advances to Manvil Development to finance *51 the construction of Venetian Park had the following characteristics. No notes or other evidence of indebtedness were issued by either corporation to the stockholders nor was there provided any collateral or security for repayment of the advances. Although amounts characterized as interest were sometimes paid, there was no written agreement as to the rate of interest to be charged and no specific provision was made for payment at any particular time, except after the last apartment was sold. It was understood the stockholders would make no demands for repayment of their advances until such time as sales permitted, and that no demands for repayment would be made which would weaken the corporations' business. The corporations had no assets from which repayment of these sums could be effected except from the eventual sale of the cooperative apartments. No attempts were made to obtain these advances from an outside lending institution or investors nor could the advances have been obtained under the same terms and informal arrangement as existed here. The advances were subject to preference in payment to the construction loan mortgages held by Peoples and Miami National. When additional *52 funds were needed to finance the construction of either Floridian Arms (Manvil Associates) or Venetian Park (Manvil Development), additional assessments would be made on Mannen, Novell, Miller, Factor and Rekant as their financial circumstances permitted at the time. It was understood that, at some point in time, adjustments would be made in the respective amounts to bring them into line with the ratio of their stockholdings. This arrangement was maintained on an informal basis and the ratios were corrected either by repayments of the advances or by payments between the individuals themselves. During its taxable year ending April 30, 1964, Manvil Development began construction of Venetian Park Gardens, an 84-unit condominium. On February 18, 1964 Manvil Development purchased the land upon which Venetian Park Gardens was to be constructed from its stockholders for $100,000 giving its shareholders a mortgage for $90,000. To finance the construction and operational costs incurred in the completion of Venetian Park Gardens, Manvil Development obtained a $180,000 construction loan from Atlantic Federal Savings and Loan Association. As security for this loan, on March 13, 1964, Manvil *53 Development, Mannen, Novell, Miller and Factor mortgaged the land to Atlantic Federal Savings and Loan Association. Manvil Development also financed this project through advances made by its shareholders. Advance deposits from the sales of condominiums were also used as a source of financing. In connection with the Venetian Park Gardens project, a stockholders' agreement was drafted governing investments by the 1132 stockholders. This agreement was proposed to the shareholders by Mannen because he desired to let the other stockholders have a greater share of the profits in the condominium project than they were entitled to by their stock ownership or investment in Manvil Development. The terms of the agreement provided in pertinent part as follows: 1. Investment in the construction phase of Venetian Park Gardens Condominium shall be in equal proportions, 25% for each of the parties. Nevertheless the first $37,500 profit to be derived from the condominium dvelopment [sic] shall inure to the benefit of the parties in proportion to their respective stock interests. The next $37,500 of profit shall be divided equally, and all profits thereafter shall be divided in the following *54 proportion: Mannen
42 1/2%
Factor
20
Miller
17 1/2
Novell
20
2. If there be a loss in the condominium development it shall be charged equally to the parties. The rationale of this is that the land can be sold at a profit before development. 3. Miller shall enjoy a 5% override on profit and on income an all [phases] of the condominium development. 4. Unanimity shall be required in all votes concerning the affairs of the corporation. 5. The provisions of this agreement apply only to the condominium phase of development undertaken by the corporation. 6. Though this be a corporation the stockholders shall have fiduciary duties, each to the other, as if it were a partnership. This agreement shall remain in full force and effect so long as the corporation shall remain in existence and can be changed only in writing subscribed by all of the parties. * * * The provisions of this agreement shall govern if in conflict with a previous agreement entered into by the parties but the previous agreement, unless explicitly modified herein, shall survive this agreement. The agreement was never signed by all the stockholders and never became effective. Nevertheless, *55 between February 7, 1964 and April 20, 1964, Oscar J. Mannen, Samuel Novell, Nathan Miller and Harvey Factor all made equal advances of $16,000 in accordance with the terms of Mannen's proposal: Mannen
Factor
2-7-64
$ 1,000
2-7-64
$ 1,000
2-26-64
2,000 2-26-64
2,000 3-17-64
4,000 3-17-64
4,000 4-3-64
3,000 4-2-64
3,000 4-13-64
3,000 4-11-64
3,000 4-20-64
3,000 4-20-64
3,000 $ 16,000
$ 16,000
Miller
Novell
2-7-64
$ 1,000
2-7-64
$ 1,000
2-21-64
2,000 3-4-64
2,000 3-17-64
4,000 3-17-64
4,000 4-3-64
3,000 4-3-64
3,000 4-11-64
3,000 4-11-64
3,000 4-20-64
3,000 4-20-64
3,000 $ 16,000
$ 16,000 These advances were set up on the books of Manvil Development in a set of shareholder "loan" accounts, similar to the accounts used to reflect shareholders' advances to Venetian Park, Manvil Development's original cooperative apartment venture. These shareholder loan accounts were separate and distinct from the shareholder loan accounts which reflected advances by these stockholders for the financing of Venetian Park. The two sets of accounts were maintained separately in order to divide the *56 activities of the two ventures. These shareholder advances had the following characteristics. No notes or other evidence of indebtedness were given to the shareholders. The advances were unsecured and no interest or repayment of principal was provided for in writing. There was no written agreement as to how much interest would be charged and there was no fixed maturity date provided for the repayment of principal other than after the sale of the last apartment. None of these stockholders would have taken any action to force payment if to do so would have weakened or undermined the corporation's economic position. The moneys advanced and invested were used to meet construction and operational costs and were all inferior to the position of the Atlantic Federal construction loan. No attempts were made by Manvil Development to obtain these advances or investments from outside sources, nor could it have done so under the same terms and informal arrangement. Before and at the time of the stockholders' advances in Manvil Associates and Manvil Development it was known that the said corporations would need additional capital for construction and operating costs. No attempts were made to *57 obtain outside sources for the amounts obtained from the various stockholders during the years in 1313 question, nor could these amounts have been obtained from outside lending institutions or investors under the same terms and informal arrangement as they were obtained. The stockholders never demanded that their advances be repaid. The advances were repaid only if the money was available. Interest was not paid at any particular time; it was paid in most cases when mony was available. On May 28, 1962, Manvil Associates and Manvil Development filed elections to be treated as small business corporations under subchapter S of the Internal Revenue Code of 1954. These elections were to be effective for the taxable years of each corporation beginning May 1, 1962. Both elections were accepted by the district director and were in effect for the taxable years of both corporations ending April 30, 1963 and April 30, 1964. Manvil Associates paid Mannen, Novell, Miller and Factor the following amounts of interest during the calendar years 1963 and 1964, as reported on their income tax returns for those years respectively: 1963
1964
Mannen
$20,036.39
$7,787.28
Novell
2,273.31
2,051.44
Miller
2,270.89
1,238.12
Factor
1,195.20
575.18
*58 Manvil Development paid them the following amounts of interest during the calendar years 1963 and 1964, as reported on their income tax returns for those years respectively: 1963
1964
Mannen
$16,440.76
$7,910.06
Novell
4,257.20
2,203.37
Miller
2,769.09
1,846.33
Factor
4,143.38
2,301.08
Manvil Associates reported a net operating loss of $19,424.67 for its taxable year ending April 30, 1963, the first year that it reported either gain or loss. The above loss was deducted by the stockholder-petitioners in their 1963 income tax returns in the following amounts: Mannen
$7,769.87
Novell
3,496.44
Factor
1,942.47
Miller
3,496.44
For its taxable year ending April 30, 1964, Manvil Associates reported a net operating loss of $85,780.85 which was deducted by the stockholder-petitioners in their 1964 income tax returns as follows: Mannen
$34,312.34
Novell
19,730.00
Factor
8,578.00
Miller
15,440.55
Manvil Development reported a net operating loss of $18,794.47 for its taxable year ending April 30, 1963, the first year that it reported either gain or loss. The above loss was deducted by the stockholder-petitioners *59 in their 1963 income tax returns in the following amounts: Mannen
$11,276.68
Novell
2,819.17
Factor
2,819.17
Miller
1,879.45
For its taxable year ended April 30, 1964, Manvil Development reported taxable income of $44,247.44. This income was reported by the shareholders on their 1964 income tax returns in the following amounts: Mannen
$26,548.46
60%
Novell
6,637.00
15
Factor
6,637.00
15
Miller 4,424,74
10
$44,247.20
100%
The Commissioner determined deficiencies in petitioners' income taxes reflecting his determination that the elections of Manvil Associates and Manvil Development to be taxed under subchapter S of the 1954 Code were terminated in 1963. Accordingly, he determined that the individual petitioners were not entitled to deduct the losses they claimed from Manvil Associates in 1963 and 1964 and from Manvil Development in 1963. Further he determined that Manvil Development was taxable under subtitle A, chapter 1 of the 1954 Code on its 1964 income. He also made the following adjustments to the reported taxable income of $44,247.44: he disallowed an interest deduction of $27,814.29, for interest paid to its stockholders *60 which he determined to constitute a dividend payment; he allowed a net operating loss deduction of $6,093.98. By amended pleadings, the Commissioner alleged in the alternative that petitioners Mannen, Novell, Miller and Factor received additional taxable income in 1964 from a recovery from Manvil Development and from a deduction of net operating losses of Manvil Associates in excess of their losses in the stock and debt of those corporations. Opinion Section 1372(e)(3), I.R.C. 1954, [3] provides that a small business corporation's election to be taxed under subchapter S of the Code shall terminate if at any time 1314 after the day on which the election is made the corporation ceases to be a small business corporation (as defined in section 1371(a)). Such termination shall be effective for the taxable year of the corporation in which the corporation ceases to be a small business corporation and for all suceeding taxable years of the corporation. Section 1371(a) defines a "small business corporation" as a corporation which, among other things, does not have more *61 than one class of stock. We must decide whether the elections of Manvil Associates and Manvil Development to be taxed under subchapter S were terminated for their taxable years 1963 (and their succeeding taxable years 1964). The Commissioner claims that the advances to those corporations by their respective shareholders during their taxable years 1963 were actually advances of equity capital that were not made substantially in proportion to their holdings of the respective corporation's capital stock and thus constituted a second class of stock. The Commissioner relies on section 1.1371-1(g), Income Tax Regs., which provides in material part as follows: Sec. 1.1371-1(g). Classes of stock. - A corporation having more than one class of stock does not qualify as a small business corporation. * * * If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets *62 of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. * * * Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change. We consider first whether the purported loans to Manvil Associates and to Manvil Development were made substantially in the *63 same proportion as the shareholder-"creditors" owned stock in the respective corporations. If the "loans" were so proportionate, the elections were not terminated whether or not the obligations which purport to represent debt actually represent equity capital. W.C. Gamman, 46 T.C. 1 (1966). There are essentially two groups of advances to Manvil Associates: (1) The $171,000 advanced by Oscar J. Mannen as Trustee; and (2) the advances by all the stockholders to finance the construction of Floridian Arms and to meet other operational costs of Manvil Associates. With respect to the $171,000, petitioners argue that in substance this advance represents an advance by all of Manvil Associates' shareholders in direct proportion to their stock ownership. These shareholders (husbands and wives as tenants by the entirety) held, as of May 1, 1962, undivided interests in the real property upon which the Floridian Arms was to be constructed in the same proportion as their stock interests in Manvil Associates, being: Mannen 40%; Novell 23%; Miller 18%; Factor 10%; and Joseph Rekant 9%. On May 1, 1962, these shareholders conveyed the land to Manvil Associates which then mortgaged *64 the land to Peoples as security for its $500,000 construction loan to Manvil Associates. On May 5, 1962, Manvil Associates entered into a 99-year ground lease with Floridian Arms, Inc., a corporate entity to be comprised of Floridian Arms' apartment owners. The lease provided for a monthly rental of $1,246.25 with an option to purchase the property for $186,937.50 between January 1, 1975 and December 31, 1978. The land was then reconveyed to the shareholders on May 7, 1962, restoring to them their original undivided interests. On May 23, 1962, all the shareholders of Manvil Associates entered into an "Agreement for Deed" with Oscar J. Mannen, "Trustee," agreeing to convey the land to him in fee simple, free of all encumbrances except the 99-year ground lease, for $171,000. The $171,000 was to be paid in the following manner: $30,000 on execution of the agreement $30,000 in thirty days $30,000 in sixty days Balance when the property was "deliverable as above." 1315 The phrase "deliverable as above" apparently refers to the requirement that the land be free of all encumbrances, including the $500,000 mortgage to Peoples. Oscar J. Mannen was to be credited with interest *65 at the rate of 10 percent per annum on each portion paid, from the date paid to the date of conveyance. Oscar J. Mannen paid $171,000 to Manvil Associates during its taxable year ending April 30, 1963. Rather than being paid in the installments provided for in the "Agreement for Deed," the entire $171,000 was paid within 7 months from the date of that agreement. Interest in the amount of 10 percent per annum was paid, presumably from the date of such advances to the date of conveyance, and was reported on Mannen's income tax. While the interest was paid by Manvil Associates, the interest obligors under the "Agreement for Deed" were obligated for the interest in amounts that were proportionate to their stockholdings so that payment of the interest by Manvil Associates would in effect constitute indirect payment by the sellers under the "Agreement for Deed." Indeed the reason alleged for the making of Mannen's payments to Manvil Associates rather than directly to the seller-shareholder was for convenience in the computation of interest. The shareholder account for the $171,000 in Mannen's name was kept separately from the normal shareholders' loan accounts to be discussed shortly. *66 The $171,000 account remained unpaid throughout Manvil Associates' taxable years 1963 and 1964. Title to the real property was transferred to Mannen on July 6, 1964, at which time the $171,000 was taken out of the account in his name and transferred to the individual accounts of the shareholder-sellers inproportion to their respective interests in the land (and directly in proportion to their respective shareholder interests in Manvil Associates). We are satisfied that the $171,000 was intended to and actually did represent a contribution by all of the shareholders directly in proportion to their interests as shareholders. The money was used by Manvil Associates to finance the construction of Floridian Arms. In form the advance appears to be from Mannen to the corporation and the interest appears to have been paid to Mannen by the corporation. Nevertheless, we are satisfied that the payments in substance were made pursuant to the "Agreement for Deed," that in effect they were indirect payments to the sellers under that agreement and that the 10 percent interest was paid indirectly by them. With respect to the regular shareholders' "loan" accounts, the shareholders had advanced the *67 following amounts as of the end of Manvil Associates' taxable years 1963, 1964 and 1965: 1963
1964
1965
Mannen
$23,182
$24,182
$53,200
Novell
10,455
13,205
28,590
Miller
8,133
10,682
24,140
Factor
4,523
5,046
12,800
Rekant
4,091
5,341
11,970
The proportion of such shareholders' advances as of such times to the total advances of all the shareholders was as follows: 1963
1964
1965
Mannen
46%
41%
41%
Novell
21
23
22
Miller
16
18
18
Factor
9
9
10
Rekant
8
9
9
The Commissioner contends that the advances represented in the shareholders' "loan" accounts - carried on the corporation's ledger sheets in the names of the husband-shareholders - were made by the husbands alone and that their wives had no interest in the advances. Accordingly he concludes that the advances were not made substantially in proportion with the husbands' shareholder interest, i.e., that the husbands, as "creditors" held preferences over their wives as regards income, liquidation, etc. To the contrary, we think the record as a whole indicates that these advances were in fact made by the respective family units, husbands and *68 wives jointly. We attach little significance to the notations on the ledger sheets of the husbands' names only. They were the active members of their respective family units. Petitioners consistently failed to make any distinction between husbands and wives, vis-a-vis, their investment in Manvil Associates. Indeed these same ledger sheets all bear the notation, after the husband-shareholder's name, of the percentage of the total common stock owned by him and his wife as tenants. For example, the ledger sheet evidencing Mannen's loan reads "Loan - O.J. Mannen 40%," when that 40% was actually owned by the husband and wife. Also, in 1964 upon transfer of title to the land to Mannen the $171,000 was transferred from Mannen's separate account into these shareholder loan accounts. It is clear that the husbands and wives owned the $171,000 equally as it represented the proceeds from the sale of land, the undivided interests in 1316 which, it has been stipulated were held by the husbands and wives as tenants by the entirety. We find that the shareholder advances to Manvil Associates were made by the owners of the nominal stock of the corporation in substantially the same proportion as *69 they owned such nominal stock. Accordingly we hold that Manvil Associates' election to be taxed under subchapter S was not terminated during either of the years in issue. In an alternative argument with respect to the tax treatment of Manvil Associates' shareholders the Commissioner contends that Novell, Miller, and Factor claimed "pass through" net operating loss deductions in 1964 in excess of their bases in the stock and debt of Manvil Associates contrary to the provisions of sections 1376 (b)(1) and (2) of the Code. Because we have decided that the $171,000 was advanced by all of the stockholders, their bases in their stock and "debt" of Manvil Associates are increased by the following amounts: Novell, $39,330 (23% of $171,000); Miller, $30,780 (18% of $171,000); Factor, $17,000 (10% of $171,000). Their bases, so adjusted, exceed the amounts of the corporation's net operating losses claimed by them during 1964. Accordingly we hold against the Commissioner on this alternative theory. As for Manvil Development, there are essentially two groups of advances to that corporation: (1) The shareholder advances to finance the construction and operational costs of Venetian Park, Manvil *70 Development's original 82-unit cooperative apartment complex and (2) the shareholder advances to finance the construction of Venetian Park Gardens, Manvil Development's 84-unit condominium. With respect to the first group of shareholder advances, the stockholders' loan accounts had the following balances as of the end of Manvil Development's taxable year ending April 30, 1963: Mannen
$128,352
57%
Novell
37,588
17
Factor
34,588
15
Miller 23,725
11
$224,253
100% Although additional amounts were paid in by the shareholders to finance the Venetian Park development during Manvil Development's taxable year ending April 30, 1964, by the end of that year, all such advances had been repaid. We find that the shareholder advances for the construction of Venetian Park were made substantially in proportion to the shareholders' respective stockholdings. Again, we find the advances were actually made by the husbands and wives and that the husbands received no preference over their respective wives in the profits or assets of the corporation. As these advances were the only ones outstanding during Manvil Development's taxable year ending April 30, 1963, we hold *71 that its election to be taxed as a subchapter S corporation was not terminated during that year. With respect to the second group of shareholder advances to Manvil Development, the stockholders all made equal advances of $16,000 in accordance with the terms of Mannen's proposed shareholders' agreement which was to govern the shareholders' investment and profit distribution from Venetian Park Gardens, the condominium. As of the end of Manvil Development's taxable year ending April 30, 1964, Mannen, Novell, Factor and Miller each had loan account balances of $16,000. These balances reflect the only outstanding shareholder advances to Manvil Development as of such time. (The shareholder advances for the construction of the cooperative apartment venture had all been repaid as of such time.) These equal advances obviously were not made substantially in proportion to the respective shareholders' interest, the advances being of equal amounts while Mannen, for example, owned 60% of Manvil Development's stock. Accordingly, we must decide whether these advances, which purport to represent debt, actually represent contributions of equity capital. The advances were made in a series of installments, *72 beginning in February 1964 and continuing into April 1964. During that same period of time Manvil Development had completed construction of Venetian Park and had sold most of the apartments in that complex. As of April 30, 1964, Manvil Development had paid off the $500,000 construction loan from Miami National and had repaid the shareholder advances used to finance the construction of Venetian Park. Thereafter the corporation continued to receive income from the sales of the remaining apartments in Venetian Park. The corporation had obtained a $180,000 construction loan from Atlantic Federal 1317 Savings and Loan but it appears it was not, as of April 30, 1964, actually indebted to Atlantic for any amount. Accordingly the only outstanding indebtedness of the corporation, as of April 30, 1964, was the $64,000 amount of advances. These advances, if they were actually intended to be loans, we think, enjoyed every reasonable prospect of repayment. Perhaps for this reason and because the shareholders otherwise appear to have dealt quite informally in regard to the nature of their advances to the corporation there is little formal evidence of the character of these advances. The advances *73 were represented by ledger sheets, which sheets were identified merely by the notation "Mannen #2," or "Novell #2," (to distinguish these loans from the loans made to finance the construction of Venetian Park which were set up in account "#1."). These sheets also contained the notation "loan," and interest was paid on the advances. We think the advances were loans and not advances of equity capital. And we do not believe that the shareholders intended by these advances to create any preference in regards to income, liquidation, etc., that were disproportionate to their stockholdings. It appears that when Manvil Development's accountant discovered that these advances, unlike all the previous advances, were not substantially in proportion to their stockholdings he questioned the shareholders about it with the consequence that shortly after April 30, 1964, they made additional advances in order to make the outstanding advances proportionate with their stockholdings. We hold that Manvil Development's election to be taxed as a subchapter S corporation was not terminated during its fiscal year ended April 30, 1964. Issue 2.. Deductibility of Loss Arising from Demolition of Building *74 Findings of Fact Petitioner Oscar J. Mannen owned a building in Hazelton City, Pennsylvania, which, during 1959, a major discount house was interested in renting. As the discount house desired additional parking space for its customers, Mannen made efforts to purchase an old wooden frame building nearby which was owned by the Hazelton City School District and was being used by it as a vocational school. His intent was to demolish the building as soon as possible after acquiring it to provide the needed parking space. Mannen offered to pay the school district $100,000 if he could acquire the property in time to obtain the lease with the discount house. While he was negotiating with the school district, however, the discount house went elsewhere. Mannen finally purchased the school property in August 1962 after which the vocational school continued to occupy the building under an informal lease with Mannen. At the end of 1962, the school district vacated the building. Thereafter the building was left vacant until it was torn down in July 1963. Mannen claimed an abandonment loss of $7,599.99 in his joint income tax return for 1963. In his statutory notice of deficiency, the Commissioner *75 disallowed the claimed deduction with the explanation: It has been determined that the loss claimed of $7,599.99 from demolition of real estate was a capital expenditure rather than an abandonment loss and, therefore, is not allowable. * * * Opinion Section 165 provides there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. A loss, in order to be deductible must involve the unintentional or involuntary loss of something of value. Wood County Telephone Co; 51 T.C. 72 (1968). Where a taxpayer purchases real property improved by a building and at the time of the purchase intends to demolish the building, he is not allowed a loss deduction under section 165 on account of the eventual demolition of the building, but must allocate the basis for the building to the underlying land. Section 1.165-3(a)(1), Income Tax Regs.; Hillside National Bank, 35 T.C. 879 (1961). The Commissioner has determined that Mannen purchased the school property with the intent to demolish *76 the building. The correctness of this determination involves a purely factual question. The burden is upon the petitioner to prove that he did not intend to demolish the building at the time he purchased it. The parties have stipulated that at the time of his negotiations with the school district in 1960, Mannen intended to demolish the building as soon as he acquired it. However, these early negotiaitons were unsuccessful. Mannen claims that at the time he actually purchased the building in 1962, he had abandoned his earlier intention to 1318 demolish the building. We do not think that he did. The building in fact was demolished approximately one year after its purchase. In the meantime, it had been leased informally to the school district on a month-to-month basis for a period of about four months. For the rest of the time, it remained vacant. There is no evidence that any improvements were made to the building or that any efforts were undertaken to make the building suitable for occupancy, although Mannen testified the building's exterior needed to be painted. Although Mannen testified that the building was suitable for office use and that efforts had been made to re-rent *77 the building after the vocational school had abandoned it, his testimony in this regard was vague and unconvincing. There is no evidence of any changes in the economic or business conditions in the area surrounding the building from the time of its purchase until its demolition that would lead to an inference that during this period Mannen changed his alleged intention to preserve the building. We find but scant evidence that Mannen ever intended to do anything with the building other than to demolish it. As petitioner has failed to carry his burden of proof, we hold he is not entitled to the claimed loss deduction. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Nathan Miller, Deceased, Amelia Miller, Executrix and Amelia Miller, docket No. 4749-67; Harvey Factor and Linda Factor, docket No. 4757-67; Oscar J. Mannen and Harriet Mannen, docket No. 4758-67; Manvil Development Corp. of Broward, docket No. 4919-67.↩
*. The figures indicated do not include respondent's claim for an increased deficiency in these years based on an alternative position taken in amendments to answers filed with the Court.↩
2. The following schedules reflect the activity in the stockholders' "loan" accounts in Manvil Associates from the date of incorporation through April 30, 1964: Oscar J. Mannen Date
Debits
Credits
Balance
1/62
$ 400.00
$10,000.00
4/62 10,000.00
Balance 4/30/62
$19,600.00
5/62
$ 400.00
6/62
$15,000.00
3,621.92
6/62
7,378.08
8/62
2,182.35
3/63 5,000.00
Balance 4/30/62
$23,182.35
5/63
$ 5,000.00
10/63
$ 8,000.00
11/63
8,000.00
11/63
20,000.00
2/64
22,000.00
22,000.00
3/64
8,000.00
4/64
6,000.00
4/64
10,000.00
Balance 4/30/64
$24,182.35
Sam Novell
4/62
$ 230.00
$ 230.00
6/62
11,721.97
6/62
1,267.12
Balance 4/30/63
$10,454.85
5/63
$ 5,750
10/63
$ 5,300.00
11/63
20,300.00
3/64
8,000.00
4/64
10,000.00
Balance 4/30/64
$13,204.85
Nathan Miller
4/62
$ 180.00
$ 180.00
6/62
7,413.50
8/62
768.56
4/63
49.48
Balance 4/30/63
$ 8,132.58
5/63
$ 2,000.00
5/63
2,499.94
5/63
49.56
10/63
$ 4,200.00
11/63
4,200.00
4/64
2,000.00
Balance 4/30/64
$10,682.08
Harvey Factor
4/62
$ 100.00
$ 100.00
6/62
5,905.48
8/62
1,359.89
4/63
21.95
Balance 4/30/63
$ 4,523.64
5/63
$ 2,000.00
$ 2,521.95
10/63
2,300.00
11/63
2,300.00
Balance 4/30/64
$ 5,045.59
Joseph Rekant
4/62
$ 90.00
$ 90.00
6/62
4,414.93
8/62
323.90
Balance 4/30/63
$ 4,091.03
5/63
$ 2,249.97
4/64
$ 1,000.00
Balance 40/30/64
$ 5,341.00
The sources for the repayments indicated in these accounts were from advance deposits made by prospective purchasers of apartments and from the ultimate sales of apartments.↩
3. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.↩